439 A.2d 110

**Frank SPECK, Jr. and Dorothy Speck, his wife and Valerie Speck, a minor, Lee Ann Speck, a minor, and Francine Speck, a minor, by their parent and natural guardian Frank Speck, Jr.**

**v.**

**Richard A. FINEGOLD and Henry J. H. Schwartz.**

**Appeal of Frank SPECK, Jr., Dorothy Speck, his wife, and Francine Speck, a minor, at No. 80–1–16.**

**Appeal of Henry J. H. SCHWARTZ at No. 80–1–19.**

**Appeal of Richard A. FINEGOLD at No. 80–1–20.**

Supreme Court of Pennsylvania.

Argued Oct. 1, 1980.

Decided Dec. 31, 1981.

78

Bruce R. Martin, Pittsburgh, for Henry J. H. Schwartz.

David H. Trushel, Pittsburgh, for Richard A. Finegold.

Thomas Hollander, Evans, Ivory & Evans, Pittsburgh, for Frank Speck, et al.

Stephen Feldman, Philadelphia, for amicus curiae.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

PER CURIAM:

## I.

■ The Order of the Superior Court allowing the parent plaintiffs' cause of action in tort, with right to recover expenses attributable to the birth and raising of their daughter, is affirmed.

(Mr. Justice Flaherty files the lead Opinion in which Mr. Chief Justice O'Brien and Mr. Justice Larsen and Mr. Justice Kauffman join. Mr. Justice Roberts, joined by Mr. Chief Justice O'Brien, files an opinion concurring in the affirmance of this portion of the Order of the Superior Court. Mr. Justice Kauffman files an Opinion concurring in the affirmance of this portion of the Order in which Mr. Justice Larsen and Mr. Justice Flaherty join. Mr. Justice Nix files an Opinion which disagrees only as to a recovery predicated upon a cause of action based upon "wrongful birth.")

## II.

■ The Order of the Superior Court, denying the parent plaintiffs' right to recover for damages for mental distress and physical inconvenience attributable to their daughter's birth is reversed.

(Mr. Justice Flaherty files the lead Opinion in which Mr. Justice Larsen and Mr. Justice Kauffman join. Mr. Justice Roberts, joined by Mr. Chief Justice O'Brien, files an Opinion concurring in the reversal of this portion of the Order of the Superior Court. Mr. Justice Kauffman files an Opinion concurring in the reversal of this portion of the Order of the Superior Court, in which Mr. Justice Larsen and Mr. Justice Flaherty join. Mr. Justice Nix files an Opinion which disagrees only as to a recovery predicated upon a cause of action based upon "wrongful birth.")

## III.

■ The Court being evenly divided on the question of whether an infant plaintiff can bring an action in the circumstances of this case, the Order of the Superior Court that the infant plaintiff's cause of action is not legally cognizable is affirmed.

(Mr. Justice Roberts, joined by Mr. Chief Justice O'Brien, files an Opinion supporting affirmance of the Order of the Superior Court denying a cause of action to the infant plaintiff. Mr. Justice Nix also files an Opinion in support of affirmance of the Order of the Superior Court denying the infant plaintiff's cause of action.)

(Mr. Justice Flaherty files an Opinion in support of reversal of the Order of the Superior Court denying the infant plaintiff's cause of action, in which Mr. Justice Larsen and Mr. Justice Kauffman join. Mr. Justice Kauffman also files an Opinion in support of reversal of the Order of the Superior Court denying the infant plaintiff's cause of action in which Mr. Justice Larsen and Mr. Justice Flaherty join.)

## OPINION

FLAHERTY, Justice.

In this case[1] Frank Speck, Jr., Dorothy Speck, his wife, and Francine Speck, a minor, by her parent and natural guardian, Frank Speck, Jr., seek to recover from Drs. Richard A. Finegold and Henry J. H. Schwartz. Action was brought in trespass and assumpsit. We are asked to review the Superior Court's order, 268 Pa.Super. 342, 408 A.2d 496, affirming in part and reversing in part the lower court's order sustaining defendant-physicians' demurrers to the complaint filed below.

The first count is brought by the husband and wife against Dr. Finegold for the birth of their daughter, Francine. In a second count, Mr. and Mrs. Speck seek damages from Dr. Schwartz for that birth. The third count seeks damages from both doctors for that birth. In a fourth count, the daughter, by her father Frank, seeks recovery from the physicians for having been born with an incurable disease.

According to the factual averments set forth in the complaints, Frank Speck, Jr. suffers from an inherited defect of the genes causing the disease neurofibromatosis.[2] Mr. Speck

1. Reassigned to this writer on December 21, 1981.

2. Neurofibromatosis (von Recklinghausen's Disease) is a disease resultant from a hereditary defect, due to an autosomal dominant gene, characterized by developmental changes in the nervous system, muscles, bones and skin. Skin changes vary from trivial (Cafe au lait spots) to *extremely* disfiguring. The condition is marked superficially by the formation of many pedunculated soft tumors (neurofibromas); however, neurofibromas are also found on cranial nerves and nerve roots. Bilateral acoustic (organs of hearing) neurofibromata (tumors on tumors) occasionally complicate neurofibromatosis in children.

Bone changes are often seen. Neurofibromata are benign and malignant change is rare. Yet, in the central nervous system malignant tumors may appear, the most common of which is glioma of the optic nerve. The condition is both congenital and heredofamilial (inherited by more than one member of a family). The clinical course is variable, making prognosis at any given time difficult. There is no known treatment or cure for the disease. Baker, *Clinical Neurology*, Vol. 3, Chapter 47, p. 38 (Rev. ed. 1980); *Dorland's*

and his wife, Dorothy, after having had two children who inherited the defect and its accompanying disease, decided not to have other children for genetic and economic reasons. Pursuant to this decision, the couple decided that Mr. Speck would get a vasectomy. On April 28, 1974 Mr. Speck entered into an oral agreement with Dr. Finegold, a urologist, that Dr. Finegold would perform a bilateral vas ligation or vasectomy upon Mr. Speck. After the vasectomy was performed, Dr. Finegold informed Mr. Speck that Mr. Speck was sterile and no supplemental method of birth control was necessary. Nevertheless, Mrs. Speck became pregnant.

Subsequent to the conception, Mr. and Mrs. Speck engaged Dr. Schwartz, by oral agreement, to terminate Mrs. Speck's pregnancy, and on December 27, 1974 Dr. Schwartz operated upon Mrs. Speck. Dr. Schwartz represented to Mrs. Speck that the operation had been successful. Later, Mrs. Speck told Dr. Schwartz that she thought she was still pregnant, but Dr. Schwartz persistently represented to her that she was not. On April 29, 1975, Mrs. Speck gave birth to a daughter, Francine, who also has neurofibromatosis. On April 9, 1976 suit was filed in the Court of Common Pleas of Allegheny County.

The Court of Common Pleas of Allegheny County, ruling on the demurrers, held that Mr. and Mrs. Speck could not assert claims resulting from the birth of Francine, but would be restricted to damages flowing from the immediate effects of the alleged negligence of both doctors. The claim of the daughter was dismissed.

A divided Superior Court affirmed the dismissal of the daughter's claim. However, it allowed that part of the parents' claim which sounded in tort, with compensable damages for the cost of rearing their daughter, but denied the parents' claim for damages for mental anguish, emotional distress and physical inconvenience. Judge Price, in a

Medical Dictionary, pp. 1040, 1041 (25th ed. 1974); Lichtenstein, "Neurofibromatosis," Archives of Neurology and Psychiatry, Vol. 62, pp. 822, 829 (1949); Matthews and Miller, Disease of the Nervous System, pp. 283, 284 (2nd ed. 1972, 1975).

concurring and dissenting opinion, would have disallowed damages for raising Francine, although he saw the first two counts as containing the traditionally cognizable allegations of negligence. He agreed, however, with the disallowance of Francine's claim.

Judge Spaeth, in a concurring and dissenting opinion, agreed with those portions of the majority opinion which afforded the parents a remedy but disagreed with the denial of the parent's claim for emotional distress and physical inconvenience attributable to Francine's birth.

The parents petitioned for allowance to appeal the Superior Court's disallowance of damages for emotional distress and physical inconvenience from Francine's birth and the dismissal of Francine's claim; the physicians cross-petitioned from the Superior Court's allowance of the parents claim in tort.[3] We granted allocatur.

The instant appeal presents two substantive issues: (1) will this Court approve a cause of action brought by the parents of an unplanned, unwanted, genetically defective child for the birth of that child and (2) will this Court approve a cause of action brought by an unplanned, unwanted, genetically defective child for the child's birth. We answer both questions in the affirmative.

I. *The Tort Action Brought by the Parents*

As to the tort action brought by the parents, we view the action for injuries suffered as a result of negligently performed vasectomy and abortion procedures as merely requiring the extension of existing principles of tort law to new facts: damages alleged to result from the birth of an unplanned, unwanted, genetically defective child. It is fundamental that one may seek redress for every substantial wrong, and that a wrongdoer is responsible for the natural and probable consequences of his misconduct. *Ayala v. Philadelphia Board of Public Education*, 453 Pa. 584, 305

3. We granted review for the purpose of considering whether plaintiffs can recover damages for injuries incurred in the circumstances of this case. Questions relating to the specificity of the pleadings may be addressed by the parties to the court below on remand.

A.2d 877 (1973); *Niederman v. Brodsky*, 436 Pa. 401, 261 A.2d 84 (1970). *See also, Carroll v. County of York*, 496 Pa. 363, 437 A.2d 394 (Kauffman, J. dissenting, 1981). Since we believe that the parent-plaintiffs have suffered a substantial wrong, an action should be permitted[4] in which the usual common-law principles of damages should be applied. Further, since the alleged injury (mental distress at having to be the parent of a defective, diseased child) was foreseeable, mental distress damages should be recoverable also.

Our determination that the parents may bring an action under a tort theory in the circumstances of this case recognizes that defendants owe plaintiffs a duty of care because plaintiffs have interests which are entitled to legal protection. Prosser, *Law of Torts*, § 53 (4th ed.). As was observed by Mr. Justice Nix in *Sinn v. Burd*, 486 Pa. 146, 164, 404 A.2d 672, 681 (1979), "the concept of duty amounts to no more than 'the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection' from the harm suffered. *Leong v. Takasaki*, 55 Haw. 398, 520 P.2d 758, 764 (1974)."

There is the view, of course, that no duty of care should extend from the doctor to the patient in a case involving damages alleged as a result of the birth of an unplanned child. One argument against the parents' right to bring an action is that because the public policy of the Commonwealth favors birth over abortion, *see* Act of June 13, 1967, P.L. 31, No. 21, § 453, added Dec. 19, 1980, P.L. 1321, No. 239, § 1, 62 Pa.S.A. § 453 (Supp.1981–1982), the approval of such a cause of action is in contravention of a legislatively declared policy. This argument cannot prevail for several reasons. Firstly, recognition of a cause of action in the circumstances of this case simply has no impact on whether abortions are performed in the Commonwealth; it neither advances nor impedes abortion activity, and therefore cannot be said to be in conflict with a public policy which favors

4. In view of this Court's recognition of the parent-plaintiffs' cause of action in tort, the applicability of a theory of relief based upon breach of contract need not be addressed.

childbirth over abortion. Rather, the recognition of such causes of action would merely accord injuries received as a result of negligently performed sterilization or abortion procedures the same legal protections accorded any other negligently performed medical procedure.

Secondly, reliance on the Commonwealth's public policy favoring birth over abortion to defeat plaintiff's cause of action cannot succeed because it squarely conflicts with the plaintiff's constitutional right as articulated in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), to seek a termination of pregnancy under certain circumstances. Were the plaintiff merely free to seek the abortion but unable to seek a remedy at law for injuries consequent upon the negligent performance of that abortion, the right would be hollow indeed.[5]

Thirdly, were no duty of care imposed upon physicians in the context of this case, and were no cause of action permitted, there would be a frustration of the fundamental policies of tort law in the Commonwealth: to compensate the victim, deter negligence, and encourage due care. Thus, in *Ayala v. Phila. Board of Public Education*, 453 Pa. 584, 599, 305 A.2d 877, 884 (1973), this Court, quoting Dean Prosser, stated:

"The "prophylactic" factor of preventing future harm has been quite important in the field of torts. The courts are concerned not only with compensation of the victim, but with admonition of the wrongdoer. When the decisions of the courts become known, and defendants realize that they may be held liable, there is of course a strong incentive to prevent the occurrence of the harm. Not

**5.** This case is to be distinguished from *Williams v. Zbaraz*, 448 U.S. 358, 100 S.Ct. 2694, 65 L.Ed.2d 831 (1980), where plaintiffs sought to compel the state to pay for abortions under the state-operated medicaid program. In that case the United States Supreme Court held that the state could not be compelled to pay monies to secure abortions for those too poor to afford them privately. Whereas that case may be taken to stand for the proposition that the state may not be compelled to fund medical treatment contrary to its own stated policies, this case merely involves the question of whether the state should grant a legal forum to permit suit for recovery for negligently inflicted injury.

infrequently one reason for imposing liability is the deliberate purpose of providing that incentive."

See also, Flagiello v. Penna. Hospital, 417 Pa. 486, 505, 208 A.2d 193, 202 (1965).

If it is the case, as alleged in plaintiffs' suit, that they have been substantially injured by the defendants' negligence, to deny plaintiffs even the opportunity to present their case in a court would be to grant an unjustifiable and unfair windfall to the defendants, who would escape liability for the harm resulting from their alleged negligence.

## II. The Tort Action Brought by the Infant

In the forefront of cases denying a legally cognizable cause of action to infants claiming damages for what some courts have termed "wrongful life," is Parker v. Chessin, mod. sub nom. Becker v. Schwartz, 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807 (1978). The New York court, in Parker, denied "wrongfully born" infants a cause of action for two reasons: (1) the court declared itself incompetent to decide whether it is better never to have been born than to have been born with even gross deficiencies, and (2) since the purpose of tort recovery is to place the injured party in the position he would have occupied absent the negligence, the infant's cause of action would force the court to calculate damages based upon a comparison between life in an impaired state and nonexistence. We reject the position taken by the New York court. Where an existing infant experiences suffering and financial expense as a result of another's negligence, that suffering and expense should be recompensed. See Curlender v. Bio-Science Laboratories, 106 Cal.App.3d 811, 165 Cal.Rptr. 477 (1980).

It should be remembered that the question before this Court is not whether plaintiffs shall be awarded damages or even whether their claims are true, but only whether the plaintiffs shall be given an opportunity to present their claims to a trier of fact. It is undoubtedly true, as a review of the cases on this subject indicates, that legal scholars are able to cite numerous theories and reasons to support the view that recovery must be defeated in all cases of this type,

and therefore that courts should not even entertain such complaints. The view that we cannot calculate the value of existence as compared to nonexistence is only one such hyper-scholastic rationale used to deny a cause of action in these cases. Those holding such views are apparently able to overlook what is plain to see: that—in cases such as this—a diseased plaintiff exists and, taking the allegations of the complaint as true, would not exist at all but for the negligence of the defendants. Existence in itself can hardly be characterized as an injury, but when existence is foreseeably and inextricably coupled with a disease, such an existence, depending upon the nature of the disease, may be intolerably burdensome. To judicially foreclose consideration of whether life in a particular case is such a burden would be to tell the diseased, possibly deformed plaintiff that he can seek no remedy in the courts and to imply that his alternative remedy, in the extreme event that he finds his life unduly burdensome, is suicide. No court in the land would directly send such a message to these plaintiffs. We deem it unfortunate that some courts have indeed sent that message by implication.

In *Flagiello v. Pennsylvania Hospital*, 417 Pa. 486, 208 A.2d 193 (1965) this Court was called upon to decide whether a plaintiff, injured during a fall caused by the negligence of hospital employees in an episode unrelated to the ailment which brought her to the hospital, would be permitted to recover from the hospital for the negligence of its employees. In both that case and the present case the question presented is whether tort recovery for a negligently inflicted injury will be permitted in broadened circumstances. Prior to *Flagiello* hospitals were immune from tort actions brought by patients. The reasoning which lay behind the resolution of *Flagiello* is applicable to the present case as well:

[The hospital] declares in effect that it can do wrong and still not be liable in damages to the person it has wronged. It thus urges a momentous exception to the generic proposition that in law there is no wrong without a remedy.

> From the earliest days of organized society it became apparent to man that society could never become a success unless the collectivity of mankind guaranteed to every member of society a remedy for a palpable wrong inflicted on him by another member of that society. In 1845 Justice STORRS of the Supreme Court of Connecticut crystallized into epigrammatic language that wise concept, as follows: "An injury is a wrong; and for the redress of every wrong there is a remedy: a wrong is a violation of one's right; and for the vindication of every right there is a remedy."

417 Pa. at 489–490, 208 A.2d at 194–195 (citation omitted). The reasoning of *Flagiello* and of other cases herein cited granting causes of action for serious wrongs is inexorable: no legal system can long withstand the consequences of the denial of a right of action when a plaintiff has suffered a "substantial" or "palpable" wrong. It would be bizarre to argue that plaintiffs in the present case are not injured. Viewing the facts well-pleaded as true, as we must when a demurrer has been granted below and is the subject of our review, plaintiffs, both the parents and their daughter, have been injured and will continue to suffer financial and emotional injury for the rest of their lives.

The Order of the Superior Court is affirmed in part and reversed in part as set forth in the Order of this Court.

LARSEN, J., joins this opinion.

O'BRIEN, C. J., joins Part I of this opinion and joins ROBERTS', J., opinion.

KAUFFMAN, J., joins this opinion and files an opinion in which LARSEN and FLAHERTY, JJ., join.

ROBERTS, J., files an opinion in which O'BRIEN, C. J., joins.

NIX, J., files an opinion dissenting from this opinion.

OPINION

ROBERTS, Justice.

 I agree with the entire Superior Court that the count seeking recovery for medical expenses arising from the allegedly improper operations should be allowed to proceed to trial. I also agree with the entire Superior Court that the count of appellants' complaint filed on behalf of their daughter for the daughter's "wrongful life" was properly dismissed. None of the highest appellate courts of other jurisdictions has recognized such a cause of action. Indeed, Alabama, *Elliott v. Brown*, 361 So.2d 546 (Ala.1978), Delaware, *Coleman v. Garrison*, 349 A.2d 8 (Del.1975), New Jersey, *Berman v. Allan*, 80 N.J. 421, 404 A.2d 8 (1979), New York, *Becker v. Schwartz*, 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978), and Wisconsin, *Dumer v. St. Michael's Hospital*, 69 Wis.2d 766, 233 N.W.2d 372 (1975) have specifically refused to do so. Even *Curlender v. Bio-Science Laboratories*, 106 Cal.App.3d 811, 165 Cal.Rptr. 477 (2nd Dist. 1980), the decision of a panel of California's intermediate appellate court upon which the opinion of Mr. Justice Flaherty relies, has recently been called into question by a subsequent panel of that same intermediate appellate court. See *Turpin v. Sortini*, 119 Cal.App.3d 690, 174 Cal.Rptr. 128 (5th Dist. 1981) (*Curlender* rejected as "unsound under established principles of law and as a sortie into areas of public policy clearly within the competence of the Legislature"). See also *Stills v. Gratton*, 55 Cal.App.3d 698, 127 Cal.Rptr. 652 (1st Dist. 1976).

As to appellants' counts relating to their own pecuniary losses and emotional distress, I would, on the peculiar facts presented, permit the action to proceed to trial. In seeking the medical services of both physicians, appellants specifically sought to avoid the possibility that they would bear a third child suffering from the crippling disease which their two children had already inherited. Pecuniary losses, including those damages flowing from the rearing of the third child, are beyond question included within the natural and probable consequences of appellees' allegedly wrongful acts,

and emotional distress is a foreseeable risk within the contemplation of the parties which is properly chargeable to appellees. See Restatement (Second) of Contracts §§ 351 & 353 (1981).

Appellees, of course, should be permitted to introduce evidence that the damages flowing from the rearing of the third child are outweighed by the benefits of joy, companionship, and affection which a child can provide. See Restatement (Second) of Torts § 920 (1979). Indeed, had a normal, healthy child been born, the trial court might well have properly dismissed that portion of the complaint seeking recovery for damages flowing from the rearing of the third child. Here, however, as the third child has inherited the crippling disease, a jury question is clearly presented as to the extent of the net harm.

I would modify the order of the Superior Court to permit trial to proceed on appellants' counts seeking recovery for emotional distress as well as pecuniary losses, within the limits set forth in this opinion.

O'BRIEN, C. J., joins in this opinion.

## OPINION

KAUFFMAN, Justice.

■ I join the Opinion of Mr. Justice Flaherty. The issue here presented is *not* whether the public policy of Pennsylvania favors birth over abortion, but simply whether one injured by the negligence of another is entitled to recover for the harm proximately caused.[1] It is now axiomatic in this Commonwealth that one may seek redress for every substantial wrong, and that a wrongdoer is responsible for the natural and probable consequences of his misconduct. *Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672 (1979); *Ayala v.*

1. As Judge Cercone perceptively wrote in his Superior Court opinion in this case:
 "The question is not the worth and sanctity of life, but whether the doctors were negligent in their surgical attempts at vasectomy and abortion."
 268 Pa.Super. 342, 355, 408 A.2d 496, 503 (1979).

*Philadelphia Board of Public Education,* 453 Pa. 584, 305 A.2d 877 (1973); *Niederman v. Brodsky,* 436 Pa. 401, 261 A.2d 84 (1970).

Nothing about sterilization or abortion requires the application of legal principles different from those controlling in other medical malpractice actions. Whether we personally like it or not, the clear and simple fact is that the medical procedures sought by Frank and Dorothy Speck are perfectly legal in this Commonwealth. *See Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Each of the appellee doctors entered into a lawful agreement with the appellant husband and wife which gave rise to a duty of care; each allegedly performed this duty negligently; and substantial damages were incurred as a direct result of this negligence. Accordingly, Frank and Dorothy Speck have alleged conduct which, if proved at trial would be clearly actionable.

The enlightened view today adopted by the majority of this Court has been expressed by the appellate courts of several states, which have afforded parents a cause of action in tort when doctors negligently perform their lawful contractual duties in sterilization procedures, *Bushman v. Burns Clinic Medical Center,* 83 Mich.App. 453, 268 N.W.2d 683 (1978); *Sherlock v. Stillwater Clinic,* 260 N.W.2d 169 (Minn. 1977); *Betancourt v. Gaylor,* 136 N.J.Super. 69, 344 A.2d 336 (1975); *Custodio v. Bauer,* 59 Cal.Rptr. 463, 251 Cal.App.2d 303 (1967), and in abortions. *Berman v. Allan,* 80 N.J. 421, 404 A.2d 8 (1979); *Wilczynski v. Goodman,* 73 Ill.App.3d 51, 29 Ill.Dec. 216, 391 N.E.2d 479 (1979); *cf. Becker v. Schwartz,* 60 App.Div.2d 587, 400 N.Y.S.2d 119 (1977), *mod.,* 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807, (1978); *Karlsons v. Guerinot,* 57 App.Div.2d 73, 394 N.Y.S.2d 933 (1977).[2]

---

2. Recognition of a cause of action for the negligent performance of lawful medical procedures certainly will not encourage or promote sterilization or abortion. Any reference in this context to the salu-

It is true that the remedy normally afforded to a party injured by the negligence of another is to be restored to the position he would have held but for the negligent conduct. It is also true that but for the negligence alleged, Francine Speck never would have been born, and that the gift of life is hardly a compensable injury. There is no need, however, for this Court to indulge in metaphysical abstractions.[3] We are *not* confronted here simply with the birth of an unwanted, but healthy child. Before us, unfortunately, is a living and breathing, but incurably diseased, deformed and suffering human being who never had a chance to be born healthy and who will be in need of extraordinary medical and other special care for the rest of her days.[4] Any argument that this life of suffering is not the natural and probable consequence of appellees' misconduct is rank sophistry. *See Curlender v. Bio-Science Laboratories*, 106 Cal.App.3d 811, 165 Cal.Rptr. 477 (2d Dist. 1980); Capron, *Tort Liability in Genetic Counseling*, 79 Columb.L.Rev. 619, 681–82 (1979); Note, *A Cause of Action For "Wrongful Life": [A Suggested Analysis]*, 55 Minn.L.Rev. 55, 71 (1970). To permit such a wrong to go unredressed would provide no deterrent to professional irresponsibility and would be neither just nor compatible with this Commonwealth's principles of tort liability.

For the majority under these circumstances to turn their backs on this *existing* child and to disregard her *actual*

tary public policy of this Commonwealth favoring childbirth over abortion is nothing more than a red herring.

3. I reject the proposition that our law is so rigid and inflexible that, to recognize a cause of action here, we must conclude that Francine Speck would have been better off had she never been born. The reality is that *she exists* and that her existence is, as cogently stated by Mr. Justice Flaherty, "foreseeably and inextricably" coupled with a painful and disfiguring disease.

4. Because demurrers were sustained by the trial court, all facts well-pleaded in the Complaint must be accepted as true.

suffering and exceptional need for medical and other assistance is a calloused and unjust act.[5]

LARSEN and FLAHERTY, JJ., join in this opinion.

## OPINION

NIX, Justice.

Three issues have been raised for our resolution as a result of the Superior Court's disposition of this matter. First, whether the unwanted and unplanned child has a right to recovery for its existence (wrongful life). Second, whether the parents of the unwanted and unplanned for child can maintain an action for the undesired birth of that child (wrongful birth). Third, in the event that either or both of these causes of action are to be recognized, the question of damages recoverable thereunder may be considered.[1]

---

**5.** Difficulties which may be encountered in precisely ascertaining damages cannot, in the interest of justice, deter recognition of a cause of action. As the United States Supreme Court has stated: Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. (Citations omitted).
*Story Parchment Co. v. Paterson P. Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1930). *See also Smail v. Flock*, 407 Pa. 148, 180 A.2d 59 (1962); Capron, *supra*, 79 Columb.L.Rev. at 649; Note, *supra*, 55 Minn.L.Rev. at 80.

**1.** A "wrongful life" action must be distinguished from an action for "wrongful birth." In an action for "wrongful life," the claim is brought by the parents as guardians ad litem on behalf of their child who is asserting that his or her birth is itself wrongful. In contrast, a "wrongful birth" claim is a claim brought by the parents in their own behalf to recover damages allegedly sustained as the result of an unwanted pregnancy and for the subsequent birth. 53 Temple L.Q. 176, n.3.

Particularly in this matter, a precise definition of the issues to be decided is critical to the analysis and the disposition. The issues here presented question whether this jurisdiction will recognize an action in negligence for a birth that absent the negligence would not have occurred. Both the unwilling parents and the unwanted child seek recovery under that theory. Supplemental to the basic issues is the measure of damage question in the event either the child or the parents are deemed to have such a cause of action. From the pleadings of record it appears that there may be other causes of action, if properly pleaded and proven, which would provide recovery for some or all of the damages claimed, regardless of the resolution to the questions raised for present disposition. Thus a rejection of the negligence claims for "wrongful birth" or "wrongful life" does not signal that an aggrieved party will be left without remedy.

## I.

I initially approach the problem from the premise that this Court is being requested to *judicially legislate* two *new* causes of action heretofore non-existent in this Commonwealth. I cannot accept the superficial view that we are merely being called upon to extend existing negligence principles to new facts. The asserted negligence is the failure of the physicians in either preventing or destroying the life of the child. This jurisdiction has heretofore never held that a birth of a human being, even though it is unwanted, constitutes a legal "injury." This has been so even though the birth resulted from the negligence of a third party. My colleagues who seek to avoid this obvious fact by saying they are merely extending existing principles of tort ignore reality.[2] *See* Comment, *Wrongful Birth: The Emerging Status of a New Tort:* 8 St. Mary's L.J. 140 (1977); *Wrongful Life: Birth Control Spawns a Tort,* 13 John Marshall L.R. 401 (1980). *See also Matter of Guardianship of Eberhardy,* 102 Wis.2d 539, 576–77, 307 N.W.2d 881, 898 (1981).

**2.** *See* Wm. L. Prosser, Law of Torts (4th ed.) § 1, pp. 3 and 4 wherein it is implied that "wrongful birth" is a new tort.

I also reject the attempt to obfuscate the impact of the proposition being urged by attempting to limit the applicability to a "genetically defective" child. First, there is absolutely no basis upon which the defective condition of the infant can be attributed to the actions of the doctor-defendants. Second, those who offer the term "genetically defective" failed to define it, nor have they suggested who is to determine those that fit within that classification.[3] Third, historically, many societal attempts to control genetics have been merely ploys for the extermination of a weaker group by a stronger and more powerful one. The real question is whether the negligent failure to prevent the birth of an *unwanted* child should be compensable.

In recent years the courts have become more realistic with reference to their role in judicial legislation. Nevertheless, the constraints in the performance of that responsibility cannot and must not be ignored. Circumspection and prudence are the qualities most needed in the performance of that function. In an area that is as provocative as the one in question, discipline must be exercised to avoid personal views from clouding legal judgment.[4]

**3.** From the pleadings in this case it only appears that the infant has the disease of neurofibromatosis. The manifestations of that disease range from the most serious consequences to the trivial. The extent of the disability in this instance is unknown and should not be assumed by the members of this Court.

**4.** Even a markedly radical jurisprudential position regarding judicial creativity in the history of tort law cautions there are some limits on judicial lawmaking. "Of course, some constraints on judicial lawmaking are so commonly understood that perhaps they need no restatement. *First*, a judge has an obligation to build on prior case law. Where he departs from that case law, the departure should be explained and the reasons for the departure stated. *Second,* judicial lawmaking should attempt to implement *societal values*, not simply the idiosyncratic views of the particular judge. To determine what these societal values are, a judge can be informed by existing legislative and judge-made law and by an examination of history." Ursin, Judicial Creativity and Tort Law, 49 George Washington Law Review 229, n. 159 (1981). (Emphasis added).

*See also*, Nix, The View From the Appellate Bench, Appendix to Purver & Taylor, Handling Criminal Appeals 397 (1980). "The concept that courts only find law, judges and justices do not make law, has been demythologized. And a near simultaneous recognition of

A court may only properly become involved in judicial lawmaking where it is directed to do so by constitutional mandate, legislative direction, or when it is articulating public policy.

## II.

First, any intimation that a recognition is required of these proffered causes of action because of constitutional mandate is completely without foundation. The United States Supreme Court decision in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and its progeny [5] do not require a state to provide recovery for "wrongful birth" or "wrongful life." The *Roe v. Wade* decision held that in the first trimester of pregnancy, a woman has a constitutionally protected freedom from unduly burdensome governmental interference in the choice of whether or not to terminate her pregnancy.

In *Maher v. Roe*, 432 U.S. 464, 475–476, 97 S.Ct. 2376, 2383, 53 L.Ed.2d 484, the Supreme Court explained:

". . . why the constitutional principle recognized in *Wade* and later cases—protecting a woman's freedom of choice—did not translate into a constitutional obligation of Connecticut to subsidize abortions, the Court cited the 'basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy. Constitutional concerns are greatest when the State attempts to

the need for deliberate restraint in the exercise of this creative function is widespread." *Id.* at 399.

**5.** *See, e.g., Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Bellotti v. Baird (Bellotti I)*, 428 U.S. 132, 96 S.Ct. 2851, 49 L.Ed.2d 844; *Beal v. Doe*, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1976); *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1976); *Bellotti v. Baird (Bellotti II)*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979); *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); *Williams v. Zbaraz*, 448 U.S. 358, 100 S.Ct. 2694, 65 L.Ed.2d 831 (1980); and *H.L. v. Matheson*, 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981).

impose its will by force of law; the State's power to encourage actions deemed to be in the public interest is necessarily far broader. . . .' Thus, even though the Connecticut regulation favored childbirth over abortion by means of subsidization of one and not the other, the Court in *Maher* concluded that the regulation did not impinge on the constitutional freedom recognized in *Wade* because it imposed no governmental restrictions on access to abortion."

*Harris v. McRae*, 448 U.S. at 315, 100 S.Ct. at 2687.

While there may be controversy regarding what constitutes an unduly burdensome governmental restriction on the right to seek an abortion,[6] there can be no question that refusal to create new tort liability does not constitute governmental interference with the constitutionally protected access to abortion. The right to seek an abortion is neither predicated upon the existence of a negligence cause of action, nor is it deterred by the absence of such a cause of action.

It is even clearer that there is no constitutional compulsion to allow a claim for "wrongful birth" to protect a preconception decision to avoid giving birth. The decision to seek sterilization as a means of contraception is clearly not entitled to any greater constitutional protection than the right of choice recognized in *Roe v. Wade, supra*. In either case the refusal of a state to recognize "wrongful birth" does not impede the decision of the parents. To the contrary, the practical effect of recognizing such a "tort" and the damages urged would in all likelihood discourage the legitimate practitioner from performing these procedures for fear that they may be inundated by such claims.

**6.** *See, e.g., Bellotti v. Baird (Bellotti II), supra,* (parental consent statute); *Planned Parenthood Ass'n v. Ashcraft,* 482 F.Supp. 679, 696 (W.D.Mo.1980) (statutory waiting period); *Margaret S. v. Edwards,* 488 F.Supp. 181, 198 (E.D.La.1980) (presumption of viability, requirement the abortion must be performed in a hospital and informed consent statutes).

## III.

Generally, it is the function of the legislature to determine what is in the public interest. By the nature of the legislature, it possesses the representative character which provides a reflection of the will of its constituency. The area in which the Court is free to articulate policy is properly a limited one.

The right of a court to declare what is or is not in accord with public policy does not extend to specific economic or social problems which are controversial in nature and capable of solution only as a result of a study of various factors and conditions. *It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring. There must be a positive, well-defined, universal public sentiment, deeply integrated in the customs and beliefs of the people and in their conviction of what is just and right and in the interests of the public weal.* Familiar illustrations are those involving unreasonable restraints of marriage or of trade, collusive arrangements for obtaining divorces, suppression of bids for public contracts, interference with freedom of conscience or religion. If, in the domain of economic and social controversies, a court were, under the guise of the application of the doctrine of public policy, in effect to enact provisions which it might consider expedient and desirable, such action would be nothing short of judicial legislation, and each such court would be creating positive laws according to the particular views and idiosyncrasies of its members. *Only in the clearest cases, therefore, may a court make an alleged public policy the basis of judicial decision.* [Emphasis added.]

*Mamlin v. Genoe,* 340 Pa. 320, 325, 17 A.2d 407, 409 (1941).[7]

7. *See Brunwasser v. Fields,* 487 Pa. 283, 409 A.2d 352 (1979); *Lurie v. Republican Alliance,* 412 Pa. 61, 192 A.2d 367 (1963); *Commonwealth ex rel. Fox v. Swing,* 409 Pa. 241, 186 A.2d 24 (1962); *Rockwell v. York Co. Ret. Bd.,* 405 Pa. 406, 175 A.2d 831 (1961); *Commonwealth ex rel. McCreary v. Major,* 343 Pa. 355, 22 A.2d 686 (1941); *Mohler's Estate,* 343 Pa. 299, 22 A.2d 680 (1941).

Clearly, there is not the unanimity of opinion in regard to either sterilization or abortion that would justify embracing a cause of action for "wrongful birth" or "wrongful life." I can think of no issue where the residents of this Commonwealth are more divided than the question of abortion. Moreover, there is a legislatively expressed policy favoring childbirth.[8] Even though there has not been a similar expressed statement relating to sterilization (here vasectomy), there are not the requisite requirements warranting a judicial pronouncement framing a tort to favor it.

It is the faith of some that sterilization is morally wrong whether to keep (a) wife from having children or for any other reason. Many people have no more compunctions against sterilization. Others are against sterilization, except when a . . . life is in danger, when a person is low mentally, when a person is an habitual criminal. There is no virtual unanimity of opinion regarding sterilization.

*Shaheen v. Knight*, 11 D. & C.2d 41, 43 (1957).

Here, there is without question an absence of the unanimity of public opinion that would justify the urged causes of action. To ignore that fact is a flagrant misuse of our role as a tribunal designed to implement societal values and not to create them.

## IV.

The same result would obtain accepting the view of those who urge that this is merely a new application of the traditional principles of negligence. In *Sinn v. Burd*, 486 Pa. 146, 164, 404 A.2d 672, 681 (1979) we recognized the conclusory nature of the concept of duty when we cited *Leong v. Takasaki*, 55 Haw. 398, 520 P.2d 758, 764 (1974), for the proposition " . . . the concept of duty amounts to no more

8. Since it is the public policy of the Commonwealth to favor childbirth over abortion. . . .
Act of June 13, 1967, P.L. 31, No. 21, § 453, added December 19, 1980, P.L. 1321, No. 239, § 1.

than 'the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection' from the harm suffered." In *Sinn* we further observed Professor Prosser found "the problems of duty is as broad as the whole law of negligence, and that no universal test for it ever has been formulated." Prosser, *supra*, § 53. There is no question but that the key analytical question is whether or not the plaintiff or plaintiffs have interests which are entitled to legal protection.[9]

It is therefore apparent that even from the point of view of my colleagues who insist that this is merely an extension of traditional negligence principles that it, nevertheless, must be shown that the public policy to be effectuated by the recognition of the causes of action is in conformity with the overwhelming weight of public opinion. Obviously, reasonable men do not agree on the issues herein raised and, therefore, a court should refrain from proceeding to make law in the midst of such controversy.

## V.

In summary, it is my view that this is an area that is best left to legislative resolution. It clearly does not provide an instance where a court should intrude. I therefore would not create a cause of action either for "wrongful life" or for "wrongful birth." I repeat, however, that it appears from the pleadings that there were other causes of action which may well provide the recovery sought by Mr. and Mrs. Speck. The court below in its ruling afforded the opportunity to the Specks to file an amended complaint and they are in a position to pursue that remedy. The access of redress to the Specks makes it evident that the Specks would not be left remediless if this Court declined to create the requested new causes of action.

**9.** No better general statement can be made, than that the courts will find a duty where, in general, reasonable men would recognize it and agree that it exists.
Prosser, *supra*, § 53.