EMMA BRAUN

*v.*

THOMAS CRAVEN.

*Opinion filed October 24, 1898.*

·1. DAMAGES—*proximate damages defined.* Proximate damages are such as are the ordinary and natural results of the defendant's negligent acts of commission or omission, and such as might reasonably be anticipated would flow therefrom.

2. NEGLIGENCE—*law regards only proximate results of negligent acts.* The law regards only the direct and proximate results of the negligent acts of a party as creating a liability against him. ·

3. SAME—*no liability exists for negligent acts resulting in mere fright or terror.* No liability exists for negligent acts which occasion fright or terror, unaccompanied by physical injury, even though a nervous shock and subsequent illness result, where the acts of negligence are not of such a character as might reasonably be expected to have the effect produced.

*Craven* v. *Braun,* 73 Ill. App. 189, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on writ of error to the Superior Court of Cook county; the Hon. JAMES GOGGIN, Judge, presiding.

The appellant sued appellee in an action on the case and filed her declaration, which contained four counts. The first count alleges that the plaintiff was living at the home of Julia Soper, in Evanston; that the defendant then and there entered the said house, and it then and there became and was the duty of the said defendant to conduct and demean himself in an orderly and peaceable manner,

and to announce or give notice and warning of his approach to and into said house and to the presence of the plaintiff, yet the defendant, wholly disregarding his duty in that behalf, neglected and wholly failed to announce his entry to the said house to the plaintiff or any other occupant thereof, but wrongfully and willfully then and there entered therein unbidden, and then and there stealthily, and without warning or announcement, entered the presence of the plaintiff, greatly surprising and shocking her; that the defendant then and there demeaned himself in the presence of the plaintiff in a violent and boisterous manner, using towards her violent, abusive and threatening language, greatly frightening, terrifying and shocking her, whereby she sustained a severe and permanent shock to her nervous system and mind, and otherwise sustained great and permanent bodily harm and injury, and became and was sick, sore and disordered, and so remained thence hitherto, during all which time she suffered, and still does and will ever suffer, great pain. The second and third counts are substantially like the first. The fourth count alleges the plaintiff was in a bed-room in a certain dwelling, which dwelling was the home and residence of the plaintiff, and then alleges the facts substantially as set forth in the first count. A general demurrer to the declaration was interposed and overruled, and a plea of general issue was filed.

The evidence showed that appellant lived with her sister, who was a tenant of appellee. Appellee went to the house to collect rent. His conduct, actions and language while there are alleged to have been so negligent that they caused the injury to appellant, by fright and mental shock, which resulted in serious physical impairment. The actions and language of appellee which are the basis of this suit are given by appellant and her witnesses substantially as follows:

When appellee entered the house, his tenant, the sister of appellant, was having her household goods removed

therefrom. Appellant testified as to what took place, as follows: "I was up-stairs in my bed-room, sitting on the floor. Something made me look up, and Mr. Craven (appellee) waved his arms and shouted. He seemed so big. I was flat on the floor. He said: 'What are you doing here? I forbid you moving. If you attempt to move I will have a constable here in five minutes. I refuse to take possession of these premises.' I was so frightened I was paralyzed with fear. I could not speak or move."

The brother of appellant testified: "I remember the day that we moved from Benson avenue down to Clark and Halsted streets. I saw the defendant at our home on that day. When I first saw him he was standing just inside the bed-room door where my sister, Mrs. Braun, was,—on the second floor. That bed-room was the northwest room. I heard him before I saw him. I heard him say: 'Here! what are you doing? Don't you move. I refuse to take possession of these premises. I will have an officer here in five minutes to stop these goods.' These words were spoken in a very loud and angry tone of voice. I was just out of sight, at the end of the hall, when he said, 'Here! what are you doing? Don't you move,' and then I came toward him to see what was the matter, not knowing what it was, and the rest of it I heard as he stood over her. She was sitting on the floor. As he was speaking these words he was swinging his arms and gesticulating very wildly. On hearing these words uttered by the defendant I hurried to the front end of the hall and saw him standing in the door. I went clear up to him. He was standing very close to my sister—clear up to her—right by her side. She was sitting flat on the floor. He was close enough to have touched her with his hands if he had so desired to. I should say close up to her—not six inches from her. Upon my going up there to where the defendant was I said, 'Here, what is the trouble here? What do you want?' He turned to me and said: 'I refuse to take possession of these premises. I will have

an officer here in five minutes to stop these goods.' When he said these words he was still close by my sister. I tried to stop him, and said, 'What is the matter?' and he turned around and went downstairs as hard as he could go. He had a long, dark or black—very dark—ulster, or storm-coat ulster I should say, and a black slouch hat, pair of overshoes' or rubbers, or something of that sort. I did not hear him approach my sister's room or go up those stairs."

An expressman, Steen, testified: "He (defendant) told me to stop loading the goods. He opened the middle door and walked very fast right up the stairs. He did not ring the bell. He wore rubbers and made no noise going up. He went into the room where the plaintiff (Mrs. Braun) was, and said: 'What are you doing here? I will have an officer here to stop these goods.' He spoke at the top of his voice. He was angry. He stood in the doorway when he did this. Plaintiff was on her knees, packing. Her brother came in the room and asked what was the matter. Defendant threw up his hands two or three times and then went down stairs." Another expressman, Schell, testified that he heard a little loud talking up-stairs,— so loud that.a man could hear it down to the first floor. No other witness for plaintiff in the trial court testified to any other acts or conduct as causing the alleged injury. Much additional evidence as to the effect of fright in causing injury was before the jury.

A verdict was returned by the jury in favor of the plaintiff, appellant here, and her damage was assessed at $9000. A motion for a new trial and a motion in arrest of judgment were both overruled and judgment was entered on the verdict. The defendant, the appellee here, sued out a writ of error from the Appellate Court for the First District to review that judgment, and by the latter court the judgment of the superior court of Cook county was reversed without remanding the cause, the Appellate Court holding, under the pleading and facts appear-

·ing in the record, there was no right of recovery. From that judgment of reversal the plaintiff in the trial court, who was defendant in error in the Appellate Court, prosecutes this appeal.

William Prentiss, Russell M. Wing, and James Heckman, for appellant.

Pliny B. Smith, and Morton V. Gilbert, for appellee.

Mr. Justice Phillips delivered the opinion of the court:

The declaration in this case charges appellee with negligence in approaching the room where appellant was, and in so speaking and acting in her presence as to cause her injury. This constitutes the entire allegation on which a recovery is sought under the various counts of this declaration.

In addition to the evidence above recited it is disclosed that appellee claimed there was rent due him, and he entered the house for the purpose of collecting the same before the tenant's goods should be removed therefrom. Under this state of facts it is necessary to determine whether the language of the appellee, his manner of entering the house and his acts therein are such as can be held to constitute negligence, and whether the injury sustained by appellant was such as might have been foreseen, or was such a natural and probable consequence, under the surrounding circumstances, as might reasonably have been anticipated as the probable result of such acts and language.

The principle is, damages which are recoverable for negligence must be such as are the natural and reasonable results of defendant's acts, and the consequences must be such as, in the ordinary course of things, would flow from the acts and could be reasonably anticipated

as a result thereof. Proximate damages are such as are the ordinary and natural results of the omission or commission of acts of negligence, and such as are usual and might have been reasonably expected. Remote damages are such as are the unusual and unexpected result, not reasonably to be anticipated from an accidental or unusual combination of circumstances,—a result beyond and over which the negligent party has no control. The law regards only the direct and proximate results of negligent acts as creating a liability against a defendant. Here, appellee approached the house and entered the same, the door being ajar. So far as the averments of this declaration are concerned he lawfully entered the house for the purpose of collecting rent. He passed noiselessly (because of wearing overshoes) up the stairs and along the hall, approached the door of the only room he saw occupied, and used the language and made the gestures testified to by the plaintiff's witnesses without impact with plaintiff's person. He then turned and left the room and went hurriedly to the office of the justice of the peace. These acts could not, in the ordinary course of things, have been reasonably anticipated to cause a diseased condition of appellant,—to create in her a seriously diseased condition. Appellee might have reasonably anticipated that his acts would cause excitement, or even fright; but fright and excitement so seldom result in a practically incurable disease that from the ordinary experience of mankind such a result could not have been expected. The evidence for plaintiff was, that by reason of the excitement and fright a condition of chorea, or St. Vitus dance, was produced. This is shown to be a diseased physical condition resulting from mental suffering, superinduced by excitement and fright, unattended by injury to the person resulting from impact. Under the pleadings in this case mere words and gestures are sought to be made actionable because of the nervous temperament of the plaintiff, without which such words and ges-

tures would not be actionable. This would introduce and incorporate in the law a new element of damage,—a new cause of action,—by which a recovery might be had for an injury resulting to one of a peculiarly nervous temperament, while no injury would result to another in identically the same position. From such a cause of action and liability for damage a dangerous use could be made. No such recovery is authorized under the common law, and no statute gives it.

In *Wyman* v. *Leavitt*, 71 Me. 227, it was said: "We have been unable to find any decided case which holds that mental suffering alone, unattended by any injury to the person, caused by simple actionable negligence, can sustain action; and the fact that no such case exists and that no elementary writer asserts such doctrine is a strong argument against it. * * * If the law were otherwise, it would seem that not only every passenger on a train that was personally injured, but every one that was frightened by a collision or by the train's leaving a track, could maintain an action against the company."

In *G., C. & S. F. Ry. Co.* v. *Trott*, 86 Tex. 12, plaintiff recovered damages for negligence of the railway company whereby his team was frightened and broke his wagon, putting him in fear and fright as to his personal safety, and causing him great mental suffering, vexation and anxiety of mind. The jury were instructed that if plaintiff was frightened and put in fear of his personal safety, and was caused mental pain or anxiety, they should allow him reasonable compensation therefor. Two questions were certified to the Supreme Court for decision, viz.: "First, in an action for damages based upon tortious and negligent conduct of a defendant, where the wrongful act caused damages to plaintiff's property but no physical injury to plaintiff, is mental suffering an element of actual damages? Second, can actual damages be recovered for mental suffering where there is no physical injury, no injury to property, nor other element of actual

damages?" The court said: "We are of the opinion that these questions should be answered in the negative. So far as we have been able to discover, all the cases involving the question of the right to recover for fright alone are in accordance with that holding."

In *Indianapolis and St. Louis Railroad Co.* v. *Stables,* 62 Ill. 313, it was said (p. 320): "We cannot readily understand how there can be pain without mental suffering. It is a mental emotion arising from a physical injury. It is the mind that either feels or takes cognizance of physical pain, and hence there is mental anguish or suffering inseparable from bodily injury unless the mind is overpowered and consciousness is destroyed. The mental anguish which would not be proper to be considered is, where it is not connected with the bodily injury but was caused by some mental conception not arising from the physical injury."

In *City of Chicago* v. *McLean,* 133 Ill. 148, it was said (p. 153): "Any mental anguish which may not have been connected with the bodily injury, but caused by some conception arising from a different source, could not properly have been taken into consideration by the jury."

In *Canning* v. *Williamstown,* 1 Cush. 452, it was said: "The argument for the defendants assumes that the plaintiff sustained no injury in his person, within the meaning of the statute, but merely incurred risk and peril, which caused fright and mental suffering. If such were the fact the verdict would be contrary to law. But we must suppose that the jury, under the instructions given to them, found that the plaintiff received an injury in his person, —a bodily injury,—and that they did not return their verdict for damages sustained by mere mental suffering caused by the risk and peril which he incurred, and though that bodily injury may have been very small, yet it was a ground of action within the statute and caused mental suffering to the plaintiff. That suffering was a part of the injury, for which he was entitled to damages."

In *Keyes* v. *Minneapolis and St. Louis Railway Co.* 36 Minn. 290, it was said: "The mental distress and anxiety which may be proved in actions for personal injuries is confined to such as is connected with the bodily injury and is fairly and reasonably the plain consequence of such injury. The mental anguish, like physical pain, to be taken into consideration in such cases is confined to such as is endured by the plaintiff in consequence of a personal injury to himself."

In *Alsop* v. *Alsop*, 5 H. & N. 534, Pollock, C. B., said: "We are all of the opinion that the defendant is entitled to judgment. There is no precedent for any such special damage as that laid in this declaration being made a ground of action, so as to render words actionable which otherwise would not be so. We ought to be careful not to introduce a new element of damage, recollecting to what a large class of actions it would apply and what a dangerous use might be made of it. In actions for making false charges before magistrates, for giving false characters, and for torts of all kinds, illness might be said to have arisen by the wrong sustained by the plaintiff. * * * This particular damage depends on the temperament of the party affected, and it may be laid down that illness arising from the excitement which the slanderous language may produce is not that sort of damage which forms a ground of action."

*Renner* v. *Canfield*, 36 Minn. 90, was a case where the defendant and a companion were driving along the highway in front of plaintiff's premises when a dog belonging to plaintiff's father attacked the dog of the defendant's companion. Defendant sprang from the wagon with his gun, whereupon the dog fled toward's plaintiff's premises, and as it ran defendant fired at and killed it. Plaintiff's wife was standing at the pump near the house and saw the defendant shoot. She was in a delicate state of health, and her nerves being very sensitive owing to her pregnancy, she was startled and frightened so that she

suffered a miscarriage and her health was seriously affected. Her fright was caused, or at least aggravated, by the mistaken impression that the defendant aimed his gun towards her. For the damages resulting from this injury the plaintiff brought his action. It was said: "The court did, however, expressly instruct the jury that the shooting of this dog by defendant was unlawful. He also instructed them that a person is liable for all the consequences which flow, naturally and directly, from his acts, and then left it to them to decide, as a question of fact, whether the injuries to plaintiff's wife were the natural result of defendant's acts. From this the jury could, and naturally would, understand that the defendant might be liable in this action from the mere fact that the killing of the dog was unlawful. We think a verdict for the plaintiff could not be sustained on such theory of the case. It is elementary that a man is liable only for the proximate or immediate and direct results of his acts. In strict logic it may be said that he who is the cause of loss should be responsible for all the losses, whether proximate or remote, which followed from his acts; but in practical workings of society any such rule would be impracticable and unjust, and therefore the law looks only to direct and proximate results; or, as the rule is sometimes stated, whoever does a wrongful act is answerable for the consequences that may ensue in the ordinary and natural course of events. There can be no fixed rule upon the subject that can be applied to all cases. Much must depend upon the circumstances of each particular case. But in this case it is very clear to us that the killing of this dog was in no sense the proximate cause of the injury to the plaintiff's wife. The act itself was not a tort of any kind against plaintiff, as the dog was not his property. The injury to the woman would have been presumably the same whether the killing of the dog was lawful or unlawful, and whether the defendant had fired at the dog or at a bird in the air. If the acts of the defendant amounted

to any tort which, in any possible view of the case, could be held to be the proximate result of the injuries complained of, the gist of it must be negligence in shooting in such proximity to a human residence as might naturally and reasonably be anticipated to be liable to injure the inmates, by fright or otherwise. We are by no means prepared to say that upon the evidence a verdict for the plaintiff could be sustained even upon that ground."

In *Scheffer* v. *W. S. R. R. Co.* 105 U. S. 249, an action was brought to recover damages for the death of Scheffer. The deceased was injured by the negligence of the railroad company, and his injuries were of so severe a character that insanity resulted, and while in that condition he committed suicide. It was said: "The proximate cause of the death of Scheffer was his own act of self-destruction. It was * * * a new cause and sufficient cause of death. The argument is not sound which seeks to trace this immediate cause of death through the previous stages of mental aberration, physical suffering and eight months of disease and medical treatment, to the original accident on the railroad. Such a course of possible or even logical argument would lead back to that great first cause, least understood, in which the train of all causation ends. The suicide of Scheffer was not a result naturally and reasonably to be expected from the injury received on the train. It was not the natural and probable consequence, and could not have been foreseen, in the light of the circumstances attending the negligence of the officers in charge of the train. His insanity, as a cause of the final destruction, was as little the natural or probable result of the negligence of the railway officials as his suicide, and each of these are casual or unexpected causes intervening between the act which injured him and his death."

In *Haile* v. *T. & P. Ry. Co.* 9 C. C. A. 134, it was said: "According to the great current of modern medical authorities insanity is a disease,—a disease of the mind,— the existence of which is a question of fact to be proved

just as much as the possible existence of any other disease. * * * While the defendant, as a common carrier, had reason to anticipate that an accident would cause physical injury and would produce fright and excitement, it had no reason to anticipate that the latter would result in a permanent injury, as, a disease of the mind, or any other disease that might be caused by excitement, exposure and hardship sometimes incident to travel. If the disease was not likely to result from the accident, and was not one which the defendant could have reasonably foreseen in the light of the attending circumstances, then the accident was not the proximate cause. The defendant had no reason to anticipate that the result of an accident on its road would so operate on Haile's mind as to produce disease,—the disease of insanity,—any more than that the exposure and hardship he suffered would produce grippe, pneumonia or any other disease. He sustained no bodily injury by the accident, so far as the petition shows; but it caused a shock and an excitement, which, under his peculiar mental and physical condition at the time, resulted in his insanity. The defendant owed him the duty to carry him safely,—not injure his person by force or violence. It owed him no duty to protect him from fright, excitement, or from any hardship that he might subsequently suffer because of the unfortunate accident."

In *Ewing* v. *P., C., C. & St. L. R. R. Co.* 147 Pa. St. 40, it was said: "It is plain from the plaintiff's statement of her case, that her only injury proceeded from fright, alarm, fear, and nervous excitement and distress. There was no allegation that she received any bodily injury. If mere fright, unaccompanied with bodily injury, is a cause of action, the scope of what are known as accident cases will be greatly enlarged, for in every case of a collision on a railroad the passengers, although they may have sustained no bodily harm, will have a cause of action against the company for 'fright' to which they have been

subjected. This is a step beyond any decision of any legal tribunal of which we have knowledge. Negligence constitutes no cause of action unless it expresses or establishes some breach of duty. What duty did the company owe this plaintiff? It owed her the duty not to injure her person by force or violence,—in other words, not to do that which, if committed by an individual, would amount to an assault upon her person; but it owed her no duty to protect her from fright, nor had it any reason to anticipate that the result of a collision on its road would so operate on the mind of a person who witnessed it, but who sustained no bodily injury thereby, as to produce such nervous excitement and distress as to result in permanent injury; and if the injury was one not likely to result from the collision, and one which the company could not have reasonably foreseen, then the accident was not the proximate cause. The true rule on this subject is as follows: 'In determining what is the proximate cause, the true rule is that the injury must be the natural and probable consequence as, under the surrounding circumstances of the case, might and ought to have been seen by the wrongdoer as likely to flow from his act,' etc. Tested by this rule we regard the injury as too remote. We know of no well considered case in which it has been held that mere fright, when unaccompanied by some injury to the person, has been held actionable. On the contrary, the authorities, so far as they exist, are the other way. * * * We need not discuss the authorities cited by the appellant. They are nearly all cases in which the fright was the result of or accompanied by a personal injury, and have no application to the case in hand."

In *Mitchell* v. *Rochester Railway Co.* 151 N. Y. 107, it was said: "While the authorities are not harmonious upon this question, we think the most reliable and better considered cases, as well as public policy, fully justify us in holding that the plaintiff cannot recover for injuries occasioned by fright, as there was no immediate personal

injury.    (Many cases cited.)    If it be admitted that no
recovery can be had for the fright occasioned by the neg-
ligence of another, it is somewhat difficult to understand
how the defendant would be liable for its consequences.
Assuming that fright cannot form the basis of an action,
it is obvious that no recovery can be had for injuries re-
sulting therefrom.    That the result may be nervous dis-
ease, blindness, insanity, or even a miscarriage, in no way
changes the principle.    These results merely show the
degree of fright or the extent of the damages.    The right
of action must still depend upon the question whether a
recovery may be had for fright.    If it can, then an action
may be maintained, however slight the injury; if not, then
there can be no recovery, no matter how grave or serious
the consequences.    Therefore, the logical result of the re-
spondent's concession would seem to be, not only that no
recovery can be had for the mere fright, but also that none
can be had for injuries which are the direct consequences
of it.    If the right of recovery in this class of cases should
be once established, it would naturally result in a flood of
litigation in cases where the injury complained of may
be easily feigned without detection and where the dam-
ages must rest upon mere conjecture or speculation.    The
difficulty which often exists in cases of alleged physi-
cal injury in determining whether they exist, and if so,
whether they were caused by the negligent act of the de-
fendant, would not only be greatly increased, but a wide
field would be open for fictitious or speculative claims.
To establish such a doctrine would be contrary to prin-
ciples of public policy.    Moreover, it cannot be properly
said that the plaintiff's miscarriage was the proximate
result of the defendant's negligence.    Proximate damages
are such as are the ordinary and natural results of the
negligence charged, and those that are usual, and may,
therefore, be expected.    It is quite obvious that the plain-
tiff's injuries do not fall within the rule as to proximate
damages.    The injuries to the plaintiff were plainly the

result of an accidental or unusual combination of circumstances which could not have been reasonably anticipated and over which the defendant had no control, and hence her damages are too remote to justify a recovery in this action. These considerations lead to the conclusion that no recovery can be had for injuries sustained by fright occasioned by the negligence of another, where there is no immediate personal injury."

In *Victorian Railway Comrs.* v. *Coultas*, L. R. 13 App. Cas. 222, it was said: "The rule of English law as to the damages which are recoverable for negligence is stated by the master of the rolls in *The Notting Hill*, (1) 9 P. D. 105, —a case of negligent collision. It is, that the damages must be the natural and reasonable result of the defendant's act,—such a consequence as in the ordinary course of things would flow from the act. * * * According to the evidence of the female plaintiff, her fright was caused by seeing the train approaching and thinking they were going to be killed. Damages arising from mere sudden terror, unaccompanied by any actual physical injury, but occasioning a mental or nervous shock, cannot, under such circumstances, their lordships think, be considered a consequence which, in the ordinary course of things, would flow from the negligence of the gate-keeper. If it were held that they can, it appears to their lordships that it would be extending the liability for negligence much beyond what that liability has hitherto been held to be. Not only in such a case as the present, but in every case where an accident caused by negligence had given a person a serious nervous shock there might be a claim for damages on account of mental injury. The difficulty which often exists, in case of alleged physical injuries, of determining whether they were caused by the negligent act would be greatly increased and a wide field opened for imaginary claims. The learned counsel for the respondents was unable to produce any decision of the English courts in which, upon such facts as were proved

in this case, damages were recovered.   *   *   *   It is remarkable that no precedent has been cited of an action similar to the present having been maintained or even instituted, and their lordships decline to establish such precedent.   They are of opinion that the first question, whether the damages are too remote, should have been answered in the affirmative, and on that ground, without saying that impact is necessary, that judgment should have been for the defendants."

In *Phillips* v. *Dickerson*, 85 Ill. 11, it was said (p. 13): "From the evidence it must be taken that the cause of this premature birth was the fear growing out of the violence of the defendant.   The question is, whether such a result was such a natural and proximate consequence of defendant's conduct as to make him liable therefor. *  .*   *   The plaintiff sues, here, for the effect of a fright which she received by reason of a quarrel between others. It took place between the defendant and the husband and boy, alone, outside of the house, upon the porch, out of the presence and out of the sight of the plaintiff, although in her hearing, she being in bed in a room some five or six feet from where the difficulty occurred, but the evidence does not show that the defendant knew the latter fact or condition of the plaintiff.   *   *   *   The result complained of was not such a consequence as, in the ordinary course of things, would flow from defendant's conduct.   He had no reason to apprehend that what took place between himself and Phillips, the husband, and the boy, alone, would occasion danger to some third person who was not present, through fright.   The injury in question not being one which the defendant could reasonably be expected to anticipate as likely to ensue from his conduct, we cannot regard it as the natural consequence thereof, for which defendant is legally responsible."

In *Fent* v. *Toledo, Peoria and Warsaw Railway Co.* 59 Ill. 349, it was said, quoting from Mr. Parsons (p. 351): "It is, that every defendant shall be held liable for all of those

consequences which might have been foreseen and expected as the results of his conduct, but not for those which he could not have foreseen and was therefore under no moral obligation to take into consideration." And the court continued: "We are disposed to regard this explanation of the rule as clearer, and capable of more precise application, than any other we have met with in our examination of this subject, and it is in substantial accord with what is said by Pollack, C. B., in *Higby* v. *Hewett*, 5 Exch. 240."

In *Derry* v. *Fletner*, 118 Mass. 131, it was said: "The true inquiry is, whether the injury sustained was such as, according to the common experience, in the usual course of events might reasonably be anticipated."

In *Hoag* v. *Lake Shore and Michigan Southern Railroad Co.* 85 Pa. St. 293, it was said: "In determining what is proximate cause, the true rule is, that the injury must be the natural and probable consequence of the negligence, —such a consequence as, under the surrounding circumstances of the case, might and ought to have been foreseen by the wrongdoer as likely to flow from his acts."

In *C., St. P., M. & O. R. R. Co.* v. *Elliott*, 55 Fed. Rep. 950, it was said: "An injury that is the natural and probable consequence of an act of negligence is actionable, but an injury that could not have been foreseen or reasonably anticipated as the probable result of the negligence is not actionable."

Appellant relies upon *Bell* v. *Great Northern Railroad Co.* 26 L. R. Ire. 432, and *Purcell* v. *St. Paul City Railway Co.* 48 Minn. 134. Both of these cases fully sustain the contention of appellant that where sudden terror occasions a nervous shock, resulting from a negligent act without impact or physical contact, by which the mind is affected, which may press on the health and affect the physical organization, a cause of action for negligence results. These cases have the approval of Mr. Beavan in his work

175—27

on Negligence, (vol. 1, pp. 76-84,) and of Mr. Sedgwick in his work on Damages, (8th ed. sec. 861.)

The *Purcell case* arose on a demurrer to the complaint, and it was conceded that the effect of a wrongful act or of negligence on the mind alone will not furnish ground of action. The entire discussion was confined to the question whether the defendant's negligence was the proximate cause of the injury, and whether, if the fright was a natural consequence thereof and caused the nervous shock and consequent illness, the negligence was actionable. While it is the duty of a carrier to anticipate that an accident or appearance of great danger will produce fright and excitement, and that an accident will cause physical injury, it could not be anticipated that a disease of the mind would result, and unless such anticipation could be had in the light of the attending surroundings it would not constitute the proximate cause of the injury, under the great weight of authority. In the *Purcell case*, fright may have been the natural consequence of the circumstances of peril and alarm in which defendant's negligence placed plaintiff, and the fright may have caused the nervous shock and consequent illness of the plaintiff, as held by the Supreme Court of Minnesota, yet if it could not have been reasonably anticipated as a result of the fright it would not be the proximate cause of her injuries. The question of the reasonable anticipation of the injury as a result of the fright is entirely disregarded in that case, and causes it to be in conflict with the weight of authority, because it absolutely disregards this principle.

In the *Bell case* an instruction was approved which read as follows: "That if great fright was, in their opinion, a reasonable and natural consequence of the circumstances in which the defendant had placed Mary Bell, and she was actually put in great fright by these circumstances, and if injury to her health was, in their opinion, a reasonable and natural consequence of such great fright and was actually occasioned thereby, damages for such

injury would not be too remote, and might be given for them if they found for the plaintiff." It was objected that the instruction was erroneous unless the fright was accompanied by physical injury, but it was held the objection was not well founded; that a nervous shock was to be considered as a bodily injury, and if such bodily injury might be a natural consequence of fright, it was an element of damages for which a recovery might be had; that as the negligence caused fright, if the fright contemporaneously caused physical injury the damage could not be too remote. This case, like the *Purcell case*, bases the right of recovery solely on the fact that negligence may cause physical injury, and hence the damage could not be too remote.

The courts in the above cases seem to have lost sight of the only safeguard against imposition in cases arising from negligence, and that is the elementary rule that before a plaintiff can recover he must show a damage naturally and reasonably arising from the negligent act and reasonably to be anticipated as a result. Two trains might be passing on a double track road, one carrying passengers and the other freight, and at the moment when the engine of the freight train is immediately opposite a passenger car it might become necessary to sound a whistle, whose effect might be to startle and greatly frighten a nervous person in the passenger car, and the fact that a whistle unexpectedly sounded would be calculated to startle and frighten a nervous person, and that such fright might produce a nervous shock that would cause physical injury, under the principle announced in the *Purcell* and *Bell cases, supra,* would authorize a recovery. That could only be done under the authority of those cases by absolutely ignoring the principle that the injury might be reasonably anticipated as the result of the act, and where it cannot be so anticipated the result is too remote. These cases are discussed by Beavan and Sedgwick without laying sufficient stress on this principle.

In our opinion these authorities, so much relied on by counsel for appellant, are not only against the great weight of authority, but are not sustainable on principle. Appellee, in this case, was on the premises to collect rent, as he lawfully might, without any knowledge of the nervous condition of appellant, and it cannot be said that his manner, language or gestures, or declared purpose of preventing the removal of the household effects of his tenants, were naturally and reasonably calculated to, or that it might be anticipated they would, produce the peculiar injury sustained by the appellant. It could not have been reasonably anticipated by the appellee that any injury therefrom could reasonably have resulted. The action is purely one of negligence, and if appellee could be held liable under this evidence, then any person who might so speak or act as to cause a stranger of peculiar sensibility passing by to sustain a nervous shock productive of serious injury might be held liable. Thus, one whose very existence was unknown to the party guilty of so speaking and acting would be given a right of recovery. Terror or fright, even if it results in a nervous shock which constitutes a physical injury, does not create a liability.

On the ground of public policy alone, having reference to the dangerous use to be made of such cause of action, we hold that a liability cannot exist consequent on mere fright or terror which superinduces nervous shock.

The Appellate Court held the language of the appellee, as disclosed by the evidence, was not such as could be held to constitute negligence, and that the injury sustained by appellant could not, according to common experience, be reasonably anticipated to result from such actions and language. We concur in that view, and the judgment of the Appellate Court for the First District is affirmed.    *Judgment affirmed.*