JANICE L. SIEMIENIEC *et al.*, Plaintiffs-Appellees, v. LUTHERAN GEN-
ERAL HOSPITAL *et al.*, Defendants-Appellants (Dr. Carol Booth *et al.*,
Defendants).

First District (2nd Division)   No. 84—290

Opinion filed June 28, 1985.

Lord, Bissell & Brook, of Chicago (Harold L. Jacobson, Patricia J. Foltz, Hugh C. Griffin, and William D. Frazier, of counsel), for appellant Michael Reese Hospital.

Cassiday, Schade & Gloor, of Chicago (Rudolf G. Schade, Jr., and John P. Stansbury, of counsel), for appellant Lutheran General Hospital.

Kenneth L. Cunniff, of Kenneth L. Cunniff, Ltd., and Jeffrey Lawrence, of Rudd & Associates, both of Chicago, for appellees.

JUSTICE HARTMAN delivered the opinion of the court:

Plaintiffs, Janice and Thomas Siemieniec, brought suit individually and on behalf of their son Adam against defendants, Lutheran General and Michael Reese Hospitals and two physicians. They allege that although they consulted with defendant physicians about whether a prospective child of theirs could be born a hemophiliac, they were assured by defendants that the possibility of this happening was at "low risk." Adam subsequently was born with hemophilia.

The four-count, verified complaint seeks damages for extraordinary medical expenses Janice and Thomas will incur in caring for Adam's condition as well as for negligent infliction of emotional distress, and damages for extraordinary expenses Adam will incur for treating his condition after he reaches adulthood. Answers were filed by the various defendants. The circuit court denied defendants' subsequently filed motions to dismiss the complaint but recognized that issues of law were presented concerning which there were substantial grounds for differences of opinion. Three questions were certified for review by this court under Supreme Court Rule 308 (87 Ill. 2d R. 308) which

contemplate whether: (1) the parents have a cause of action for the extraordinary medical expenses of the hemophiliac child during his minority; (2) the parents have a cause of action for negligent infliction of emotional distress; and (3) the child has a cause of action on his own behalf for extraordinary medical expenses during the age of majority. We have rearranged the order of the questions for purposes of analysis and review.

The pertinent facts alleged in the complaint follow. For the purpose of the motions to dismiss they must be taken as true. (*Wilczynski v. Goodman* (1979), 73 Ill. App. 3d 51, 54, 391 N.E.2d 479; *Goldberg v. Ruskin* (1984), 128 Ill. App. 3d 1029, 1032-33, 471 N.E.2d 530.) Janice became pregnant and was concerned about the possibility of her baby being born with hemophilia because two of her cousins were afflicted with the disease. She sought medical advice from Dr. Carol Booth at Lutheran General, who advised her on March 6, 1980, of diagnostic tests which would be performed in time for Janice to decide whether or not to abort the pregnancy if the tests proved positive. Janice indicated that, if positive, she would abort. At Dr. Booth's referral, Janice later consulted with Dr. Juan Chediak at Michael Reese. He gave her the same information regarding testing. Dr. Chediak also promised both to check on whether Janice's cousins were registered hemophiliacs and to examine her deceased cousin's death certificate. On March 28, 1980, Dr. Chediak sent a letter to Dr. Booth stating that the risk of Janice being a carrier of factor VIII hemophilia was "very low." Dr. Booth then sent a copy of this letter to Janice. On October 14, 1980, Adam Siemieniec was born and, after a bleeding episode, he was diagnosed as a factor IX hemophiliac.[1]

The complaint also alleged that defendants were under a duty to render competent diagnostic and consultive services which was breached by failure to adequately inform Janice about various types of hemophilia, for one of which, factor IX, there is no reliable test, and by failure to inquire adequately into her own health background.

---

[1]For purposes of general and descriptive information only, hemophilia is a hereditary blood clotting disorder which affects mostly males. It is caused by the deficiency or inactivity of coagulation factors needed for blood clotting. It occurs in different levels of severity. Hemophilia A, sometimes called "classic hemophilia," is due to deficiencies in clotting factor VIII and is the most common type, accounting for 70-80% of hemophilic patients. Hemophilia B, sometimes called "Christmas disease" (named after the first family found to have this condition), is due to a deficiency in clotting factor IX, which accounts for another 10-15% of the patients. Merieux Institute, Inc., Changing Concepts No. 2 Genetic Counseling in the Hemophilias (1978); Miller & Lubs, The Inheritance of Hemophilia 2 (1980).

Plaintiffs, individually in counts I and II, seek to recover from defendants the extraordinary medical expenses that they will incur during their son's minority and for their emotional distress. Counts III and IV, brought by Janice and Thomas on Adam's behalf, seek recovery from defendants for the extraordinary medical expenses that he will incur as an adult.

## I

Defendants contend that parents cannot maintain an action for "wrongful birth" under Illinois law, arguing that Adam's parents do not have a cause of action for the extraordinary medical expenses incurred during his minority. It should be observed at once that nowhere in their complaint do Janice and Thomas assert that they are seeking damages for wrongful birth. Their sole claim for damages is for the extraordinary expenses they anticipate as a result of Adam's impaired physical condition. In any event, the sole authority for defendants' argument is the supreme court's decision in the consolidated cases of *Cockrum v. Baumgartner* and *Raja v. Tulsky* (1983), 95 Ill. 2d 193, 447 N.E.2d 385, *cert. denied sub nom. Raja v. Michael Reese Hospital* (1983), 464 U.S. 846, 78 L. Ed. 2d 139, 104 S. Ct. 149. They note that there a wrongful-birth cause of action was rejected on the basis of the following four factors: (1) the speculative nature of damages; (2) the concern that a child will discover that he is unwanted; (3) it is unreasonable to place the burden of rearing a child on defendant, while allowing plaintiffs to enjoy the benefits of having a child; and (4) the possibility of fraudulent claims. 95 Ill. 2d 193, 198.

■ It is useful here to distinguish between "wrongful pregnancy" cases, such as *Cockrum*, and "wrongful birth" cases, such as the case before us. In a wrongful-pregnancy action, the alleged injury to the parent is the birth of the unplanned or unwanted, but usually normal and healthy, child, resulting from the negligence of a doctor or other health care provider in performing an abortion, sterilization, or in filling a prescription for contraceptives, whereas, in a wrongful-birth action, the injury usually claimed is the birth of a seriously handicapped or diseased child whose birth might have been prevented except for the negligence of those charged with prenatal testing, genetic prognosticating and counseling parents as to the likelihood of giving birth to a physically or mentally impaired or abnormal child.[2] Although in each

---

[2]See *Phillips v. United States* (D.S.C. 1981), 508 F. Supp. 544, 545 n. 1; Note, *Damages for Wrongful Birth and Wrongful Pregnancy in Illinois*, 15 Loy. U. Chi. L.J. 799, 799-807 (1984).

instance suit is brought by the parents, the resultant effects of the subject birth are usually dramatically different. Not to be confused with the foregoing is still another type of action known as "wrongful life," brought by parents on the child's behalf, claiming that because of defendant's negligence his adult life will be burdened with an impaired existence occasioned by the abnormal or unusual health condition with which he must live. We will treat this issue in part III of this opinion.

■ The utility in keeping the concepts described above separate and distinct for analytical purposes lies in the appropriate resolutions of questions of duty, asserted violations of that duty, proximate causes of the injuries sustained, and damages cognizable as a result of such injuries, with public policy as the frame of reference.

Although defendants acknowledge that *Cockrum* involved a healthy child, they argue the applicability of its rationale to the case at bar for the following reasons: the *Cockrum* court's declaration that the "benefit of life should not be outweighed by the expense of supporting it" (*Cockrum v. Baumgartner* (1983), 95 Ill. 2d 193, 201); the pro-life policy announced in the Illinois abortion law (Ill. Rev. Stat. 1983, ch. 38, par. 81—21), as reflected in *Cockrum*, when the court declared that public policy demands the preservation and development of family relations (95 Ill. 2d 193, 201); and that the United States Supreme Court's decision in *Roe v. Wade* (1973), 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705, does not confer a right upon plaintiff to pursue a civil action because an abortion was not performed. Defendants' reliance upon *Cockrum*, however, is misplaced in this context.

The economic relief sought in the present case is related solely to the physical defects with which Adam was born, allegedly as a result of negligent advice, and the extraordinary, unanticipated expenses which Janice and Thomas, his parents, will incur as a result thereof, a matter standing distinctly apart from the issue raised in *Cockrum*: whether the birth of a normal, healthy, but unwanted child can be considered as compensable damages to his parents because of anticipative costs incurred in his ordinary upbringing involving no extraordinary expenses, which the supreme court answered in the negative in *Cockrum*, as did this court in *Wilczynski v. Goodman* (1979), 73 Ill. App. 3d 51, 391 N.E.2d 479, cited and quoted with approval in *Cockrum v. Baumgartner* (1983), 95 Ill. 2d 193, 201. The *Cockrum* plaintiffs sought damages for the entire general expenses of raising a normal, healthy child, in addition to the mothers' damages for pain and suffering, plus medical expenses and lost time; here, the parents are willing to absorb those expenses themselves and seek only the costs for Adam's extraordinary medical expenses occasioned by the congenital defect. The *Cock-*

*rum* plaintiffs did not rely on defendant physicians' advice in carrying their child to term; there was such asserted reliance in the instant case. In *Cockrum*, the medical error of a failed sterilization did not deprive plaintiffs of their rights to make an informed abortion decision; in the instant case, the alleged failure to prognosticate probable hemophilia in the unborn child deprived plaintiffs of the information necessary for such a decision and its attendant extraordinary financial consequences.

Considering the concerns of our supreme court in *Cockrum*, a wrongful-pregnancy action, we note that the first problem, the speculative nature of damages, does not apply here. This is not only because the action is not based upon wrongful pregnancy as in *Cockrum*, involving philosophical and ontological issues weighing the value, if any, of no existence with no attendant expenses, versus a normal, healthy existence with the usual expenses of raising an unplanned or unwanted child. Here, Janice and Thomas accept Adam's existence and are willing to expend whatever funds are necessitated for ordinary upbringing. They seek only the extraordinary expenses of treating Adam's hemophilia, which is well within the methods of proof employed in personal injury cases. See, *e.g., Jacobs v. Theimer* (Tex. 1975), 519 S.W.2d 846, 849.

The concern in *Cockrum*, that the child will discover that it was not wanted is unwarranted here. The Siemieniecs have asserted that they did want a child; they only sought to avoid burdening their child with a hemophiliac condition. The *Cockrum* court's desire to avoid placing the undue burden of rearing costs on a defendant also need not be considered in the instant case. Plaintiffs here do not seek to have defendants pay ordinary costs incurred for raising Adam, but rather liabilities that will be incurred for his extraordinary medical expenses. (*Cf. Wilczynski v. Goodman* (1979), 73 Ill. App. 3d 51, 391 N.E.2d 479.) The opportunities for fraudulent claims under these circumstances are no greater than in any other personal injury claim.

In wrongful-birth settings, as contrasted to wrongful-pregnancy cases, courts in other jurisdictions have acknowledged a causal link between a physician's failure to diagnose or inform parents of potential birth defects and injury to the parents' interests. *Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 656 P.2d 483; *Robak v. United States* (7th Cir. 1981), 658 F.2d 471 (applying Alabama law); *Naccash v. Burger* (1982), 223 Va. 406, 290 S.E.2d 825; *Schroeder v. Perkel* (1981), 87 N.J. 53, 432 A.2d 834; *Speck v. Finegold* (1981), 497 Pa. 77, 439 A.2d 110; *Berman v. Allan* (1979), 80 N.J. 421, 404 A.2d 8; *Becker v. Schwartz* (1978), 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807; *Dumer v. St. Michael's Hospital* (1975), 69 Wis. 2d 766, 233 N.W.2d

372; *Jacobs v. Theimer* (Tex. 1975), 519 S.W.2d 846.

In Illinois, the appellate court recently recognized such an action brought by parents of a child born with Tay-Sachs disease, permitting the recovery of medical and associated expenses in *Goldberg*. As anticipated with this disease, the child there died during his infancy, however, leaving a somewhat different question, since damages would be incurred for a relatively short time by virtue of the disease involved. Continuing damages for extraordinary expenses for a prospectively much longer period of time is at issue in the case *sub judice*. In an earlier case, *Doerr v. Villate* (1966), 74 Ill. App. 2d 332, 220 N.E.2d 767, the appellate court recognized an action which also sought long-term expenses as damages. There, the father unsuccessfully sought sterilization after the birth of two retarded children. The mother proceeded against the physician for breach of an asserted contract to produce an expressly promised and warranted result and for breach of defendant's implied warranty to perform the sterilization services in a skillful manner after she gave birth to a third retarded and physically deformed child. Relying upon *Zostautas v. St. Anthony De Padua Hospital* (1961), 23 Ill. 2d 326, 329, 178 N.E.2d 303, the court found no impediment to plaintiff's right to proceed in contract for property damages although she could have sought damages under a malpractice theory instead. (*Cf. Rogala v. Silva* (1973), 16 Ill. App. 3d 63, 305 N.E.2d 571.) The case before us similarly limits damages requested. Although it is not an action for property damages as in *Doerr v. Villate* (1966), 74 Ill. App. 2d 332, 220 N.E.2d 767, it eliminates damages for the existence of life itself.

Our supreme court in *Cockrum* may well have suggested that the case of a child handicapped with a genetic disease might be treated differently than a claim emanating from wrongful pregnancy. For example, the court emphasized the normalcy and healthiness of the child when it identified the issue as "whether plaintiffs may recover as damages the costs of rearing a healthy child." (*Cockrum v. Baumgartner* (1983), 95 Ill. 2d 193, 197.) Further in the opinion, the court observed that "many courts have declared an unwillingness to hold that the birth of a normal healthy child can be judged to be an injury to the parents," citing and quoting with approval from other jurisdictions, as well as our own opinion in *Wilczynski v. Goodman* (1979), 73 Ill. App. 3d 51, 391 N.E.2d 479, all of which involved the births of normal, healthy children. (95 Ill. 2d 193, 198-201.) Finally, the court noted that in addition to supporting life and its preservation, public policy requires the development and preservation of family relations as well. (95 Ill. 2d 193, 201.) We are persuaded here that life and family will be more likely

preserved if negligent defendants are required to contribute to such extraordinary out-of-pocket expenses as a fact finder may attribute to their conduct in the instant case. See Note, *Damages for Wrongful Birth and Wrongful Pregnancy in Illinois*, 15 Loy. U. Chi. L.J. 799, 828-29 (1984).

One of the duties required of a physician toward his patient is to disclose accurately the nature and risks of treatment which the patient is advised to undergo. (*Fure v. Sherman Hospital* (1978), 64 Ill. App. 3d 259, 380 N.E.2d 1376.) That duty has been extended to an obligation to give a woman accurate professional advice in making an abortion decision. (*Colautti v. Franklin* (1979), 439 U.S. 379, 58 L. Ed. 2d 596, 99 S. Ct. 675; *Berman v. Allan* (1979), 80 N.J. 421, 404 A.2d 8.) Causes of action against physicians for inadequate or insufficient diagnosis or advice in the abortion decision context have been upheld. (See, *e.g., Berman v. Allan* (1979), 80 N.J. 421, 404 A.2d 8; *Becker v. Schwartz* (1978), 41 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807; *Goldberg v. Ruskin* (1984), 128 Ill. App. 3d 1029, 471 N.E.2d 530.) We do so here and answer the first certified question in the affirmative: Adam's parents have a cause of action to recover extraordinary medical expenses during his minority.

## II

Plaintiffs here also assert a cause of action for negligent infliction of emotional distress. Defendants maintain that such an action has no basis in Illinois and they note that case law historically has barred recovery for negligent infliction of emotional distress unless there was a contemporaneous physical impact or injury suffered by plaintiff. (*Braun v. Craven* (1898), 175 Ill. 401, 51 N.E. 657.) There is a limited exception to this "impact rule" recently recognized by our supreme court, and cited by both parties to this appeal, wherein a bystander "who is in a zone of physical danger and who, because of the defendant's negligence, has reasonable fear for his own safety is given a right of action for physical injury or illness resulting from emotional distress." (*Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546, 555, 457 N.E.2d 1.) Subsequent cases have strictly construed this exception. (*Maere v. Churchill* (1983), 116 Ill. App. 3d 939, 452 N.E.2d 694; *Rahn v. Gerdts* (1983), 119 Ill. App. 3d 781, 455 N.E.2d 807.) Other jurisdictions have both rejected emotional distress claims in wrongful-birth actions (*Moores v. Lucas* (Fla. App. 1981), 405 So. 2d 1022; *Howard v. Lecher* (1977), 42 N.Y.2d 109, 397 N.Y.S.2d 363, 366 N.E.2d 64; *Becker v. Schwartz* (1978), 41 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807; *Jacobs v. Theimer* (Tex. 1975), 519 S.W.2d 896), and have allowed such

recovery. *Phillips v. United States* (D.S.C. 1983), 575 F. Supp. 1309; *Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 656 P.2d 483; *Speck v. Finegold* (1981), 497 Pa. 77, 439 A.2d 110; *Berman v. Allan* (1979), 80 N.J. 421, 404 A.2d 8; *Eisbrenner v. Stanley* (1981), 106 Mich. App. 357, 308 N.W.2d 209.

We believe that *Rickey* is controlling in a negligence setting. Although it is conceivable that Janice and Thomas could formulate a cause of action for "physical injury or illness" referred to in *Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546, 555, we are unable to perceive, under the facts of this case, how they can satisfy the preceding requirement of the *Rickey* rule, namely, that they were "in a zone of physical danger and *** [had] reasonable fear for *** [their] own safety ***." (98 Ill. 2d 546, 555.) It is true that plaintiff's presence in a zone of physical danger was not required in *Knierim v. Izzo* (1961), 22 Ill. 2d 73, 174 N.E.2d 157; but there, the circumstances involved an intentional infliction of emotional distress, rather than mental distress caused by another's negligence as here, and the intentional conduct was extreme and outrageous, unlike the facts alleged in this case. See *Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546, 550.

Accordingly, we must hold in answer to certified question No. 2 that, absent allegations and proof of intentional and outrageous conduct, or that plaintiffs were at high risk to themselves of physical impact resulting in their physical injury or illness by reason of the emotional distress caused by a defendant's negligence, they have no cause of action for emotional distress damages. *Cf. Goldberg v. Ruskin* (1984), 128 Ill. App. 3d 1029, 1043.

### III

██ █ Lastly, we consider Adam's action on his own behalf for extraordinary medical expenses which he expects to incur during his majority. It should be noted at the outset that Adam does not claim any damages other than those reflected in out-of-pocket extraordinary expenditures, unlike *Zepeda v. Zepeda* (1963), 41 Ill. App. 2d 240, 190 N.E.2d 849, *cert. denied* (1964), 379 U.S. 945, 13 L. Ed. 2d 545, 85 S. Ct. 444, in which an illegitimate child sued his biological father for damages resulting from his bastard status. Defendants' reliance upon *Zepeda* is misplaced, since that case involved a healthy, normal child, unlike the case before us. Defendants here argue that Adam's claim for relief does not allege that they caused Adam's hemophilia, but only that they were negligent in preventing Adam's mother from having an abortion. Thus, defendants maintain, Adam's action is for wrongful life, seeking damages which would require measurement of the differ-

ence between a defective life and no life at all.

A number of other jurisdictions have rejected similar causes of action. (*Elliott v. Brown* (Ala. 1978), 361 So. 2d 546; *DiNatale v. Lieberman* (Fla. App. 1982), 409 So. 2d 512; *Payton v. Abbott Labs* (1982), 386 Mass. 540, 437 N.E.2d 171; *Miller v. Duhart* (Mo. App. 1982), 637 S.W.2d 183; *Strohmaier v. Associates in Obstetrics & Gynecology* (1982), 122 Mich. App. 116, 332 N.W.2d 432; *Schroeder v. Perkel* (1981), 87 N.J. 53, 432 A.2d 834; *Becker v. Schwartz* (1978), 41 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807; *Gildiner v. Thomas Jefferson University Hospital* (E.D. Pa. 1978), 451 F. Supp. 692; *Phillips v. United States* (D.S.C. 1981), 508 F. Supp. 544; *Dumer v. St. Michael's Hospital* (1975), 69 Wis. 2d 766, 233 N.W.2d 372.) These decisions often reflect the now-discarded rationale of the New Jersey Supreme Court in *Gleitman v. Cosgrove* (1967), 49 N.J. 22, 28, 227 A.2d 689, 692, which rejected a wrongful life cause of action on the basis that it could not weigh the value of an impaired life against no life at all. (See *Procanik v. Cillo* (1984), 97 N.J. 339, 351, 478 A.2d 755, 762.) In *Becker v. Schwartz* (1978), 41 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807, the court rejected wrongful life claims in consolidated cases involving failure to diagnose Down's syndrome and failure to inform parents of the inheritability of a kidney disorder. That court found that such a cause of action was flawed in that: (1) the infant had suffered no legally cognizable injury because there is no legal right to be born whole; and (2) the typical negligence remedy of putting the injured party in the position he would have been in had the negligence not occurred would require comparing impaired life with nonexistence, a comparison better left to philosophers. (*Becker v. Schwratz* (1978), 41 N.Y.2d 401, 407, 413 N.Y.S.2d 895, 900, 386 N.E.2d 807, 812.) In *Goldberg*, the appellate court rejected a wrongful life claim which did not seek only extraordinary medical expenses, as here. *Goldberg v. Ruskin* (1984), 128 Ill. App. 3d 1029, 1036-37.

Recently, however, the supreme courts of New Jersey, Washington and California have permitted children to pursue actions limited to recovery for extraordinary expenses to be incurred in managing and treating genetic diseases. (*Procanik v. Cillo* (1984), 97 N.J. 339, 478 A.2d 755; *Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 656 P.2d 483; *Turpin v. Sortini* (1982), 31 Cal. 3d 220, 237-38, 643 P.2d 954, 965, 182 Cal. Rptr. 337, 347-48.) In a fourth case, *Speck v. Finegold* (1981), 497 Pa. 77, 439 A.2d 110, because of an equal division of opinions among the justices of the Pennsylvania Supreme Court, the trial court's denial of the cause of action was upheld.

In Illinois, our supreme and appellate courts have considered

whether an infant has the right to be born whole and have concluded that such a right exists. (*Renslow v. Mennonite Hospital* (1977), 67 Ill 2d 348, 367 N.E.2d 1250; *Rodriquez v. Patti* (1953), 415 Ill. 496, 114 N.E.2d 721; *Daley v. Meier* (1961), 33 Ill. App. 2d 218, 178 N.E.2d 691.) Although none of the cited cases involve the precise issue presented here, the reasoning set forth is instructive. The *Renslow* court, in arriving at its conclusion, stated, in part (67 Ill. 2d 348, 357-58):

"This court has long recognized that a duty may exist to one foreseeably harmed though he be unknown and remote in time and place. (*Wintersteen v. National Cooperage & Woodenware Co.* (1935), 361 Ill. 95, 103. See generally *Skinner v. Anderson* (1967), 38 Ill. 2d 455.) Also, derivative actions, such as those of a husband or parent for the loss of the wife's or child's services, demonstrate that the law has long recognized that a wrong done to one person may invade the protected rights of one who is intimately related to the first. (See *Dini v. Naiditch* (1960), 20 Ill. 2d 406.) In these cases, because of the nature of the relationship between the parties harmed, the law recognizes a limited area of transferred negligence. Prosser, *Palsgraf Revisited*, 52 Mich. L. Rev. 1, 20-22 (1953).

The cases allowing relief to an infant for injuries incurred in its previable state make it clear that a defendant may be held liable to a person whose existence was not apparent at the time of his act. We therefore find it illogical to bar relief for an act done prior to conception where the defendant would be liable for this same conduct had the child, unbeknownst to him, been conceived prior to his act. *We believe that there is a right to be born free from prenatal injuries foreseeably caused by a breach of duty to the child's mother.*

The extension of duty in such a case is further supported by sound policy considerations. Medical science has developed various techniques which can mitigate or, in some cases, totally alleviate a child's prenatal harm. In light of these substantial medical advances it seems to us that sound social policy requires the extension of duty in this case." (Emphasis added.)

In our opinion, the health care providers involved in the present case could have reasonably foreseen that one's life would be impaired by being born with hemophilia, at least to the extent of requiring extraordinary treatment with concomitant expenses. The duty to properly advise the parents of such a possibility was the responsibility of defendants here. The failure to fulfill that duty, if proved, affected not only the child's parents, but, as demonstrated in *Renslow*, even more

profoundly affected the child, Adam, himself. *Procanik v. Cillo* (1984), 97 N.J. 339, 351, 478 A.2d 755, 762; *Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 476, 656 P.2d 483, 497; *Turpin v. Sortini* (1982), 31 Cal. 3d 220, 229, 643 P.2d 954, 960, 182 Cal. Rptr. 337, 343, citing *Renslow*, among other authorities.

With respect to defendants' argument, that they were not the cause of the disease, but that they merely failed to reveal the real possibility of its existence, it is possible that defendants' alleged breach of duty could be found to have resulted in the birth of a child who has been diagnosed as a factor IX hemophiliac and whose medical care is estimated to exceed that which is anticipated for the care for a normal, healthy child. Since it is here alleged that had Janice known of this she would have aborted his birth, the proximate causation may be proved to the satisfaction of the fact finders upon trial. See, *e.g., Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 476, 656 P.2d 483, 497.

■ Defendants insist, however, that recognition of Adam's cause of action would require measuring the value of impaired life with non-existence, which is better left to philosophers and the legislature.[3] Further, they urge that recognition of his claim would disavow the sanctity of life, contrary to our pro-life abortion statute and to the supreme court's position in *Cockrum*, if not our own position in *Wilczynski*. (See also *Berman v. Allan* (1979), 80 N.J. 421, 427, 404 A.2d 8, 12-13; *Phillips v. United States* (D.S.C. 1981), 508 F. Supp. 537, 543.) We disagree.

The action articulated on Adam's behalf claims a real rather than a theoretical injury. It is definable by recognized tort standards and seeks recompense only for extraordinary expenses, not damages for being born impaired as against the value of not being born at all. (See, *e.g., Procanik v. Cillo* (1984), 97 N.J. 339, 478 A.2d 755.) Adam's complaint does not require ontological discussion; merely the right to prove, if he can, what his unusual condition will cost when he reaches majority. The issue presented here is not a question of evaluating impaired existence vis-a-vis no existence, nor is it whether a normal, healthy child is a benefit, blessing or detriment to parents who did not want him, as in *Cockrum* and *Wilczynski*. Rather, Adam's existence, although im-

---

[3]Some of the more interesting case debates on this subject have been recorded and analyzed in legal literature; *e.g.,* Capron, *Tort Liability in Genetic Counselling,* 79 Colum. L. Rev. 618, 647-60 (1979); Persky, *Wrongful Life: The Dawning of a New Cause of Action in Illinois?,* 71 Ill. B.J. 594 (1983); Annot., 83 A.L.R.3d 15 (1978); Comment, *"Wrongful Life": The right Not to be Born,* 54 Tul. L. Rev. 480, 494-97 (1980). We need not tarry with these considerations in view of our perspective of the case at bar.

paired, is accepted. The narrow damage issue here seeks no payment of any kind for the day-to-day expenses, nor even for pain and suffering. (*Cf. Goldberg v. Ruskin* (1984), 128 Ill. App. 3d 1029, 471 N.E.2d 530.) Solely the out-of-pocket extraordinary expenses which may be incurred are sought in Adam's behalf, and those only for the period of time after he reaches majority. No overlapping between damages for extraordinary expenses sought by Janice and Thomas during his minority and those pursued for Adam would thereby take place.

In our opinion, what Adam seeks are not damages for "wrongful life"; plainly, he seeks the same legal rights for redress of otherwise cognizable damages that every other person possesses. The anomaly inherent in allowing parents to recover damages in wrongful-birth cases involving impaired life, but denying recovery by the handicapped child of the same damages (see, *e.g., Speck v. Finegold* (1981), 497 Pa. 77, 439 A.2d 110; *Becker v. Schwartz* (1978), 41 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807; *Robak v. United States* (7th Cir. 1981), 658 F.2d 471), has been articulated in *Turpin v. Sortini* (1982), 31 Cal. 3d 220, 238-39, 643 P.2d 954, 965, 182 Cal. Rptr. 337, 348, the California Supreme Court noting:

> "If such a distinction were established, the afflicted child's receipt of necessary medical expenses might well depend on the wholly fortuitous circumstance of whether the parents are available to sue and recover such damages or whether the medical expenses are incurred at a time when the parents remain legally responsible for providing such care.
>
> Realistically, a defendant's negligence in failing to diagnose an hereditary ailment places a significant medical and financial burden on the whole family unit. Unlike the child's claim for general damages, the damage here is both certain and readily measurable. Furthermore, in many instances these expenses will be vital not only to the child's well-being but to his or her very survival. (See *Schroeder v. Perkel, supra*, 432 A.2d 834, 841.) If, as alleged, defendants' negligence was in fact a proximate cause of the child's present and continuing need for such special, extraordinary medical care and training, we believe that it is consistent with the basic liability principles of Civil Code section 1714 to hold defendants liable for the cost of such care, whether the expense is to be borne by the parents or by the child. As Justice Jacobs of the New Jersey Supreme Court observed in his dissenting opinion *** in *Gleitman v. Cosgrove, supra*, 227 A.2d at page 703: 'While the law cannot remove the heartache or undo the harm, it can afford some reasonable measure of compensa-

tion towards alleviating the financial burdens.' "

We conclude, in answer to the third certified question, that the child has a cause of action on his own behalf for extraordinary medical expenses during his majority.

In summation, the circuit court decision is affirmed as to its denial of defendants' motions to dismiss plaintiffs' complaint seeking extraordinary medical expenses associated with Adam's hemophiliac condition during his minority and adulthood; we reverse the circuit court's denial of defendants' motions to dismiss Janice and Thomas' action for negligent infliction of emotional distress; and we remand the case for trial.

Affirmed in part, reversed in part and remanded.

STAMOS, P.J., and PERLIN, J., concur.